[No. 14403-8-III. Division Three. January 23, 1997.]

MARY A. ALEXANDER, *Appellant*, v. THE COUNTY OF WALLA WALLA, ET AL., *Respondents*.

---

R. *Gary Ponti* and *McAdams, Ponti & Junke*, for appellant.

*George B. Fearing* and *Leavy, Schultz, Davis & Fearing*; and *Richard F. Monahan* and *Roach, Monahan & Lowry*, for respondents.

SCHULTHEIS, A.C.J. — After she drove her car into another vehicle, Mary Alexander sued the County and City of Walla Walla and three individual law enforcement officers, alleging the officers negligently failed to prevent her from driving while drunk. The court dismissed the complaint on summary judgment after finding Ms. Alexander did not fit within any exception to the public duty doctrine under the circumstances she alleged. She contends the court could not make that determination on the disputed facts before it. We disagree and conclude the officers did not owe Ms. Alexander a duty of preventing her from committing the criminal offense of driving under the influence of intoxicating liquor. Therefore, we affirm.

The following facts are taken from the parties' depositions. According to Ms. Alexander, when she got off work at 2 p.m. on January 9, 1990, she went to see her friend Shari Harmon. The women spent the afternoon and eve-

ning talking and drinking. At some point during the night, Shari's husband Don joined them in the Harmon kitchen and they all continued drinking. The Harmons began arguing, the argument escalated into physical fighting, and Mr. Harmon began threatening that "somebody was going to die." He yelled out for his two children, who had been awakened by the fighting. Ms. Alexander dialed 911 and told the children to stay hidden until the police got there. After Mr. Harmon helped her provide the right address and yelled out to the operator to get over there, someone was going to die, he yelled at Ms. Alexander for calling the police and told her to leave. She went outside. She knew she was too drunk to drive, but was not sure what to do because she had intended to stay overnight at the Harmons' house. She waited for the police.

Walla Walla County Sheriff's Deputy Gary Batt and Walla Walla City Police Officers Steve Slawson and Lou Reed were dispatched to the Harmon residence. They arrived in separate cars, at 4 a.m. or a little after. As Deputy Batt got out of his car, Ms. Alexander came across the yard to meet him, excited and upset. She explained the situation to Deputy Batt: the Harmons had been fighting and had "kind of stopped," but she "was afraid somebody was going to get hurt," that Mr. Harmon "was going to hurt the kids." She said she "told the kids to hide." The City police officers waited nearby.

According to Ms. Alexander, she also told Deputy Batt she was drunk and had planned to stay over, but did not know what to do now that Mr. Harmon was angry. She said Deputy Batt told her she needed to leave and get out of the situation, and when she said she did not think she had her driver's license on her and expressed doubt that she could drive, he told her "It doesn't matter. You need to leave. Mary, you will be fine." She worried aloud that he would cite her for driving while intoxicated (DWI) as soon as she pulled out, and he told her "No, Mary; I won't give you a DWI. You will be fine." He then told her "We need to go in. You need to go now. You need to leave." As

the officers approached the house, Ms. Alexander walked to her car, got in and drove off.

According to Deputy Batt, he did not notice Ms. Alexander had been drinking and did not recall her saying anything about it. To him, she seemed frightened and excited, and wanted them to hurry because she was worried about the children. They were walking toward the house as they talked, and after she explained the situation, she asked if she should come with them. Deputy Batt told her two or three times to "[G]et back. Stay away." He did not recall any conversation about her driving her car. He said their conversation was rapid and very short, just long enough for him to get information from her about the situation.

Officer Reed estimated he and Officer Slawson were about 20 feet from Deputy Batt and Ms. Alexander. He did not hear any of their conversation; his attention was focused on the house. Officer Reed said he did not know who Ms. Alexander was, or how she fit into the picture (a neighbor, maybe), but as soon as the deputy finished talking with her, he came up to the city officers and said "let's go in, or, [l]et's go" and they approached the house.

Officer Slawson heard bits and pieces of the conversation between Deputy Batt and Ms. Alexander. He remembered thinking Ms. Alexander was intoxicated, but he did not remember why he formed that opinion. He did not hear her say anything about not being able to drive or any discussion about her getting a DWI, but he did remember her saying something about not having her driver's license. As Officer Slawson recalled, Ms. Alexander wanted to leave because Mr. Harmon was angry, but he did not know she was going to drive until he saw her leaving in her car.

The Harmons let the three officers into the house, and showed them things had quieted down, everything was under control and no one was hurt. The children were watching television. The officers had been inside just a few minutes when a report came in that there had been an ac-

cident nearby. One of the city police officers commented that it might be the lady who had just left. It was. Ms. Alexander had driven her car into the back of a van parked on a nearby street. Her blood alcohol content was .12 at 6:10 a.m. and .10 at 7:45 a.m.

Ms. Alexander brought this negligence action against the officers and their government employers. Asserting the public duty doctrine, the defendants moved for summary judgment. Ms. Alexander claims the officers acquired a special duty of care to her under the failure to enforce and special relationship exceptions to the public duty doctrine. She opposed summary judgment by arguing the court could not determine whether either exception applies without resolving disputed facts, including: how intoxicated she was, the officers' knowledge of her condition, whether Deputy Batt told her to get into her car and leave despite the fact she had expressed concern that she was too drunk to drive, whether he gave her express assurances that she could drive and whether she was in a public place. The court decided Ms. Alexander could not fit within either exception under the most favorable interpretation of the alleged facts. Consequently, the court granted summary judgment and dismissed the complaint.

This court reviews an order of summary judgment de novo, engaging in the same inquiry as the trial court. RAP 9.12; *Wilson v. Steinbach*, 98 Wn.2d 434, 656 P.2d 1030 (1982). Summary judgment is appropriate if the parties' pleadings, affidavits and depositions establish there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A material fact is one affecting the outcome of the litigation. *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). Facts must be interpreted in the light most favorable to the nonmoving party, but questions of fact may be determined as a matter of law when reasonable minds could reach but one conclusion. *Id.* at 703-04.

The threshold determination in any negligence action is a question of law; that is, whether a duty of care is

owed by the defendant to the plaintiff. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 168, 759 P.2d 447 (1988). Regardless of whether the defendant is a governmental entity, whose case is analyzed under the public duty doctrine, or a private person, whose case is analyzed under basic tort principles, the duty must be one owed to the injured plaintiff individually and not one owed to the public in general. *Id.* at 163. The concept of a duty is a reflection of all those considerations of public policy that lead the law to conclude a plaintiff's interests are entitled to legal protection against the defendant's conduct. *Id.* at 168.

Ms. Alexander first contends the defendants owed her a duty based on the failure to enforce exception to the public duty doctrine, which is explained in *Bailey v. Town of Forks*, 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987). In *Bailey*, a woman injured by a drunk driver filed a complaint against the town of Forks, alleging her injuries resulted from a town police officer's failure to prevent a man he knew to be heavily intoxicated from driving a truck. The Supreme Court reversed the trial court's dismissal on summary judgment and remanded for trial. The court held the injured woman satisfied all three requirements of the failure to enforce exception to the public duty doctrine. First, the police officer had a duty to enforce state statutes prohibiting drunk driving, RCW 46.61.502, former RCW 46.61.515, and a duty under RCW 70.96A .120(2) to take into custody a publicly incapacitated individual. Second, the injured woman alleged the officer had actual knowledge of the statutory violations and took no corrective action. Third, the woman (a passenger on a motorcycle) came within the class the statutes were intended to protect. *Id.* at 268-69.

Here, however, although the three officers had the same general duties as the Forks officer, Ms. Alexander did not allege any facts showing they possessed actual knowledge of statutory violations. During their contact with Ms. Alexander, she was not driving or in physical

control of a vehicle, and none of them observed her get into her car. In addition, she did not allege any facts tending to show she fit within the statutory definition of a person who appears to be incapacitated or gravely disabled by alcohol, as those terms are used in RCW 70.96A.120(2). *See* RCW 70.96A.020(12), (13). Thus, the officers did not possess actual knowledge of statutory violations and could not, at that time, enforce either statute.

■■ More importantly, however, neither statute was enacted to protect drunk drivers from themselves or to shield them from responsibility for their own actions. To protect the users of highways from intoxicated drivers, RCW 46.61.502 makes it a criminal offense to drive while intoxicated. The law is designed to deter drunk drivers, *see Bailey*, 108 Wn.2d at 269, not to protect them or excuse them. And by its own terms, RCW 70.96A.120(2) excepts from the category of persons a peace officer should take into protective custody "a person who may be apprehended for possible violation of laws relating to driving or being in physical control of a vehicle while under the influence of intoxicating liquor . . . ." Ms. Alexander's injuries and property damage resulted from her own criminal act, and a rule allowing her to shift the responsibility for her actions to the police would be contrary to public policy.

■ Recently, the Washington Supreme Court held commercial vendors (tavern owners) who serve alcohol to obviously intoxicated patrons are not liable if the patrons suffer harm as a result. In other words, commercial vendors owe no duty of care to adult patrons who suffer injuries as a result of their own intoxication. *Estate of Kelly v. Falin*, 127 Wn.2d 31, 42, 896 P.2d 1245 (1995). The court held the common law rule does not permit intoxicated adults to hold commercial vendors liable for furnishing them alcohol, and the law making it a criminal act to sell alcohol to intoxicated adults was not intended to shield the drunk driver from responsibility for his or her own actions. *Id.* at 37-39. The court noted:

Adults are expected to temper their alcohol consumption or

simply refrain from driving when intoxicated. Unlike an innocent bystander hit by a drunk driver or a youth whose sense of immortality leads to reckless abandon, the responsibility for self-inflicted injuries lies with the intoxicated adult.

*Id.* at 39-40. The court did not find it unfair for liability to turn on the identity of the victim (drunk driver or innocent third party), and opted for personal accountability. It agreed with the Oklahoma Supreme Court that as a matter of public policy drunken persons who harm themselves are responsible for their condition, and should not prevail against others either under a common law or statutory basis.

Similarly, the critical difference between Ms. Alexander's case and *Bailey* should be as dispositive as it is obvious. Knowing herself to be too drunk to drive, she did so anyway, whereas Ms. Bailey was the innocent victim of someone like Ms. Alexander. The Forks police had a duty to protect Ms. Bailey from someone they knew was driving while intoxicated, but these Walla Walla officers did not have a duty to protect Ms. Alexander from herself.

 Ms. Alexander also contends the defendants owed her a duty based on the special relationship exception to the public duty doctrine. That exception has three requirements, too: (1) direct contact or privity between the public official and the injured plaintiff that sets the latter apart from the general public, (2) express assurances given by the public official, and (3) justifiable reliance by the plaintiff on those assurances. *Honcoop v. State*, 111 Wn.2d 182, 191-92, 759 P.2d 1188 (1988); *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 534, 871 P.2d 601, *review denied*, 124 Wn.2d 1029 (1994). Neither implied nor inherent assurances are sufficient. *Honcoop*, 111 Wn.2d at 192.

Here, there was no direct contact between Ms. Alexander and the City officers, no conversation, and no express assurances by them about anything. Regardless whether Ms. Alexander thought Deputy Batt was telling her she would be fine if she got into her car and drove away, she

acknowledged she knew she had had too much to drink and should not drive. She also acknowledged the deputy did not expressly assure her she was not too drunk to drive. Any reliance Ms. Alexander placed on the deputy's "assurance" was not justified. She, alone, was responsible for the consequences of her choices.

Because the three officers owed no duty of care to Ms. Alexander, the court properly dismissed the defendants on summary judgment. As it recognized, although there were disputed facts, none of them were material.

We affirm.

THOMPSON, J., and MUNSON, J. Pro Tem., concur.